[Crim. No. 7582. Third Dist. Apr. 9, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD ROMO et al., Defendants and Appellants.

**COUNSEL**

James D. Garbolino and Richard L. Reese, Jr., under appointments by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold Overoye, Marjory Winston Parker and Kevin M. Corrington, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

EVANS, J.—A jury found defendant DeWitt guilty of murder of the first degree, and defendant Romo guilty of murder of the second degree; and they have appealed from the judgments.

This case discloses a sordid, gruesome, and tangled skein of facts from which a consistent factual thread stands out with sufficient clarity to make it possible to condense a factual summary.

On December 30, 1973, Romo, Rick Fournier (the murder victim), Kim Treharne (half brother of Romo), Bonnie Tovar (common law wife of DeWitt), Ace Waldner and Linda Drouin (Romo's girl friend) spent approximately 10 hours at Romo's residence in Sacramento drinking extensively. At approximately 10:30 p.m., all except Linda Drouin, who was ill, left Romo's house and traveled to DeWitt's home. Romo, Kim and Bonnie traveled together, and Fournier and Ace drove to DeWitt's house in Ace's car. Fournier appeared to be intoxicated; Romo appeared somewhat intoxicated but was capable of coherently conversing and driving the vehicle from his home to DeWitt's home without apparent trouble. At DeWitt's, additional drinking took place. Romo and Fournier (the victim) had a slight altercation but reconciled their differences. DeWitt later attacked Fournier and was joined in the attack by Romo and Kim. The three of them beat Fournier with their fists and kicked him about the head and body. Fournier, intoxicated but conscious, was lying on the floor not resisting. DeWitt ordered Bonnie to insert a dildo in Fournier's rectum. Bonnie resisted but was threatened by DeWitt and thereafter complied. After this assault upon Fournier, DeWitt was heard to state, "We're going to have to, . . . dust this guy, he [Fournier] could violate our parole by a report to the police." Hearing this, Fournier began pleading for his life. DeWitt pulled Fournier's trousers up, taped Fournier's hands behind his back, and blindfolded him with pieces of sheet. DeWitt and Romo forced Fournier to his feet and took him to the car Romo was using. At this time Fournier was conscious and pleading for his life. The defendants left with Fournier from DeWitt's home at about 12:45 a.m. with Romo driving, DeWitt in the passenger seat, and Fournier bound and blindfolded in the rear seat. Fournier's body was

found several hours later with a bullet hole in his head and two through his body. As DeWitt and Romo were leaving DeWitt's home with Fournier, Kim observed a .38 caliber pistol in DeWitt's rear pocket.

Kim Treharne was granted immunity to testify at the trial. Prior to trial, a motion to sever, pursuant to section 1098 of the Penal Code, was made by DeWitt. Counsel for Romo expressly disclaimed any intention of joining in the motion. DeWitt's motion was submitted without argument or citation of authority. However, the prosecutor supplied the court with his understanding of the reason for the motion and the authorities relied upon by DeWitt.[1] The prosecutor advised the court that Romo had made two extrajudicial statements to police officers but that the statements would not be used in the prosecution's case in chief; however, if Romo testified, the People would offer one of the statements in rebuttal. The motion was submitted without argument and denied.

On appeal, DeWitt contends, (1) the denial of the motion for severance of trials was a deprivation of the Sixth Amendment right to confrontation; (2) it was error and an abuse of discretion for the trial court to deny the motion for severance of trials; (3) the facts are insufficient to support a first degree murder conviction; and (4) the uncorroborated testimony of an accomplice (Romo) was an insufficient basis to sustain a conviction.

On appeal Romo contends, (a) the denial of the severance motion was a denial of due process where antagonistic defenses exist between the codefendants; (b) the prosecutor committed misconduct by his reference to the parole status of Romo; (c) incompetency of trial counsel; and (d) the prosecution's reliance upon the felony-murder doctrine denied due process of law.

SEVERANCE

For different reasons, DeWitt and Romo attack the trial court's denial of the motion to sever trials. ■ DeWitt contends he was denied his Sixth Amendment confrontation rights by the introduction of Romo's extrajudicial statements, because the Sixth Amendment guarantees the right to confront and cross-examine extrajudicial declarants at the time the statement is made. He did not have such opportunity and argues as a

---

[1]*People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]; *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620].

result, his confrontation rights were violated. His assertion does not accurately reflect the law.

In *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930], the court sets forth the present rule regarding the use of extrajudicial statements as follows: "[T]he Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." In 1971, the court reaffirmed this doctrine in *Nelson* v. *O'Neil* (1971) 402 U.S. 622 [29 L.Ed.2d 222, 91 S.Ct. 1723]. That case involved a joint trial at which incriminating extrajudicial statements of one codefendant tending to implicate the other were admitted. Both defendants here, however, took the stand and testified. The court, in *O'Neil* at page 627 [29 L.Ed.2d at page 227], stated: "The Constitution as construed in *Bruton* . . . , is violated *only* where the out-of-court hearsay statement is that of a declarant who is unavailable at the trial for 'full and effective' cross-examination." (Italics in original.) In both *Green* and *O'Neil*, both defendants testified as witnesses and were subject to full and effective cross-examination. Thus, no violation of the confrontation clause existed.

In *Bruton* v. *United States, supra,* 391 U.S. 123, the extrajudicial statement of a codefendant was admitted which implicated both the defendant *Bruton* and the codefendant. The court there stated, " 'A defendant may be prejudiced by the admission in evidence against a co-defendant of a statement or confession made by that co-defendant. This prejudice cannot be dispelled by cross-examination *if the co-defendant does not take the stand.* Limiting instructions to the jury may not in fact erase the prejudice. . . .' " (Italics added.)

In support of their assertion that denial of the motion for severance was reversible error, both defendants urge upon the court the holding of *People* v. *Aranda, supra,* 63 Cal.2d 518. We distinguish that case because the court's holding there is confined to the singular factual situation presented. The principal evidence against defendant *Aranda,* and upon which his conviction was obtained, was the extrajudicial statement of codefendant Martinez. Under circumstances where no clear evidence of joint action, or other evidence under which the conviction could clearly stand, is presented, the court established the procedures to be followed: "When the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the following procedures: (1) It can permit a

joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established. [Fn. omitted.] (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible."

*Aranda* distinctions have been previously made. (*People* v. *Epps* (1973) 34 Cal.App.3d 146, 157 [109 Cal.Rptr. 733].) ▪ It is not *Aranda* error to admit into evidence the admission or confession of one defendant, which reflects his commission of a crime that is revealed by the physical evidence, even though such evidence might reflect on the issue of whether or not the crime was actually committed also by another, who is linked to the offense by evidence other than the confession. In such circumstances, the joint trials have been held eminently proper. (*People* v. *Diaz* (1969) 276 Cal.App.2d 547 [81 Cal.Rptr. 16].) Where both defendants implicate themselves in the offense charged in a joint conversation, separate trials are not indicated by *Aranda*. (*People* v. *Fuller* (1969) 268 Cal.App.2d 844, 854-855 [74 Cal.Rptr. 488].) In view of the decisions in *California* v. *Green, supra,* and *Nelson* v. *O'Neil, supra,* the *Aranda* principle must be narrowly applied.

### DENIAL OF SEVERANCE AS ABUSE OF DISCRETION

DeWitt asserts the denial of the severance motion was an abuse of discretion. And, for the first time here on appeal, DeWitt asserts that when the severance motion was denied, the trial judge failed to take into account the dictates of *People* v. *Massie* (1967) 66 Cal.2d 899, 916-917 [59 Cal.Rptr. 733, 428 P.2d 869], and did not exercise discretion in the denial. Neither contention has merit. The motion for severance as disclosed by the augmented reporter's transcript on appeal indicates DeWitt made *no* reference to any of the dictates of *Massie* allegedly applicable to his case. That record further fails to reveal any request by Romo for a severance of the trial and to the contrary, contains a disclaimer from participating in such motion. ▪ The trial court is not obliged to order separate trials *sua sponte.* The granting or denial of a request for severance must be supported by a showing of grounds at the

time the motion is made, and not upon what may have transpired thereafter. (*People* v. *Simms* (1970) 10 Cal.App.3d 299, 307 [89 Cal.Rptr. 1].) The existence of any abuse of discretion in the denial of a motion for severance can only be determined on the showing made by the defendant at the time of the motion. (*People* v. *Clark* (1965) 62 Cal.2d 870 [44 Cal.Rptr. 784, 402 P.2d 856].) DeWitt made a motion for severance not joined in by Romo. Counsel submitted the motion without comment and neither counsel made a showing as to factual or legal grounds requiring such severance. A denial of the motion for severance under such circumstances is not error, let alone reversible error. (*People* v. *Wallace* (1970) 13 Cal.App.3d 608, 616 [91 Cal.Rptr. 643].) ■ Section 1098 of the Penal Code makes joint trials of jointly charged defendants the rule, not the exception, in California. A person jointly accused with another does not have a right to a separate trial, but has merely the right to ask for it; and the court is vested with the discretion to grant or deny such request. (*People* v. *Simms, supra,* 10 Cal.App.3d 299, 307.) Under the circumstances here presented, the trial judge was under no *sua sponte* duty to order a separate trial for either Romo or DeWitt. (*People* v. *Simms, supra; People* v. *Martin* (1971) 17 Cal.App.3d 661, 671 [95 Cal.Rptr. 250].)

## SUFFICIENCY OF THE EVIDENCE

■ In support of this contention, DeWitt speciously argues his conviction was totally based upon the uncorroborated testimony of defendant Romo, an accomplice. He studiously disregards the mountainous volume of other evidence supporting his conviction. DeWitt emphasizes his testimony of nonparticipation and argues that Romo's extrajudicial statements were the only evidence determinative on the question of his guilt or innocence. The record reflects overwhelmingly to the contrary. The defendant Romo testified fully to the facts as we have set them forth. Romo implicated DeWitt in the shooting as well as the kidnapping and assault. This testimony was corroborated by the testimony of Kim Treharne and Bonnie Tovar in every respect except for the firing of the gun. DeWitt's testimony was that of total nonparticipation. He admitted participation in the earlier assault but denied participation in the kidnapping and murder.

■ In reviewing the evidence on appeal, the applicable test is not whether guilt has been proven beyond a reasonable doubt, but whether substantial evidence supports the conclusion of the trier of fact. The reviewing court does not perform the function of reweighing the

evidence; instead, the court must draw all inferences in support of the verdict that can be deduced reasonably from the evidence. (*People* v. *Culver* (1973) 10 Cal.3d 542, 548 [111 Cal.Rptr. 183, 516 P.2d 887].) The test is whether there is substantial evidence, including inferences reasonably deduced from facts in evidence, to support the finding of guilt. (*People* v. *Bard* (1968) 70 Cal.2d 3, 4-5 [73 Cal.Rptr. 547, 447 P.2d 939].) "Substantial evidence" is evidence that reasonably inspires confidence and is of solid value. (*People* v. *Bassett* (1968) 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 443 P.2d 777].) The appellate court must look at the entire picture placed before the jury. On review we must examine the evidence for and against premeditation and deliberation and weigh them in the balance. The objective is not to replace the jury but to satisfy ourselves that the verdict is reasonable. If it is, it should stand, even though a verdict on a lesser crime is equally reasonable. This appraisal of premeditation and deliberation relating to murder is primarily a jury function and is afforded a wide field of discretion; the jury determination is final. (*People* v. *Bassett, supra,* 69 Cal.2d 122; *People* v. *Holt* (1944) 25 Cal.2d 59, 89-90 [153 P.2d 21].)

On the question of sufficiency of the evidence of premeditation and deliberation, the court in *People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942], stated as follows: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' (*People* v. *Thomas, supra,* 25 Cal.2d 880, at pp. 898, 900, 901 [156 P.2d 7]); (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically where there is evidence of all three types and

otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (Italics in original.)

■■■ We find substantial evidence to satisfy the trilogy of circumstances outlined in *People* v. *Anderson, supra.* His planning activity commenced after the violent and sordid assault on the victim when he declared the victim would have to be "dusted." DeWitt bound and blindfolded the victim and thereafter, with Romo's assistance, took him to the car. DeWitt was observed at this time to be armed with a .38 caliber pistol.

A shallow and needless motive, but nonetheless genuine, was shown by DeWitt's statement that the victim would have to be dusted to prevent his possible report to the police of the violent assault and the consequential violation of DeWitt's parole. When asked why he had shot the victim, DeWitt replied, "He would have snitched on us." Viewing the evidence as we must on appeal in a manner most favorable to the verdict, DeWitt is shown to have led the victim from the car, stood over him and fired three shots from the revolver into his body, one in the head and two in the back. Upon returning to the car, Romo asked what happened and DeWitt replied, "I blew the . . .'s brains out."

There was sufficient evidence to support the conviction.

### Prosecutor Misconduct

■■■ Among Romo's remaining contentions, he asserts the prosecutor committed reversible misconduct by a reference to Romo's parole status. The burden of proof in these circumstances is on Romo to show the existence of misconduct by the prosecutor. (*People* v. *Beivelman* (1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913].) ■■■ Misconduct is a dishonest act or an attempt to persuade the court or the jury by use of deception or reprehensible methods. Whether the prosecution has committed misconduct depends upon the particular circumstances of each case and bad faith must be shown to establish the existence of misconduct; bad faith is manifested where the prosecutor intentionally asks questions, the answers to which he knows to be inadmissible because they are prejudicial to the accused. (*People* v. *Rhinehart* (1973) 9 Cal.3d 139, 154 [107 Cal.Rptr. 34, 507 P.2d 642]; *People* v. *Collins* (1964) 228 Cal.App.2d 460, 463 [39 Cal.Rptr. 595]; *People* v. *Stokley* (1968) 266 Cal.App.2d 930, 935 [72 Cal.Rptr. 513].) ■■■ The statement regarding parole status was in response to a question by the prosecutor not

specifically directed at eliciting information about the criminal past of either DeWitt or Romo. The first reference to Romo's parole status was not by the People but by counsel for DeWitt when cross-examining Kim Treharne. Romo testified and, as reflected by the augmented reporter's transcript, had always intended to testify concerning his criminal past and his parole status. At trial Romo made no objection to references to his parole status by either the prosecutor or counsel for DeWitt. This complaint of alleged error is without merit and is sophistry at best. (*People* v. *Asta* (1967) 251 Cal.App.2d 64, 87 [59 Cal.Rptr. 206].)

## INEFFECTIVE COUNSEL

■ Romo argues he was denied effective assistance of counsel as a result of counsel's failure to raise a diminished capacity defense on his behalf. The argument is illusory. The court in *People* v. *Rowland* (1971) 21 Cal.App.3d 371, 373 [98 Cal.Rptr. 419], most accurately assesses this sort of attack: "[Romo] does not attack the sufficiency of the evidence, but, as is now the prevailing custom on appeal, ignores the effectiveness of the evidence against him and blames his conviction on trial counsel." This attack is further perplexing in view of the fact that complete instructions on diminished capacity were given.

The record accurately and adequately reflects direct, as well as circumstantial, evidence on the question of diminished capacity on behalf of Romo. DeWitt's only defense was no involvement, and the record does not reflect the *prosecution* offering or tendering evidence on the defense of diminished capacity for Romo. The jury resolved this question against Romo following his taking the stand and presenting a lucid description of the ugly events occurring on the night of the kidnap-murder. Romo has simply failed to carry the burden of demonstrating his denial of effective assistance of counsel. Our determination on appeal, when ineffectiveness of defense counsel is asserted, must be to determine whether or not actions of defense counsel, or failure to act, resulted in withdrawing crucial defenses or reduced the trial to a mere farce or sham. (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) To justify reversal on such grounds, an extreme case must be shown as a demonstrable reality and not as a speculative matter. (*People* v. *Stephenson* (1974) 10 Cal.3d 652, 661 [111 Cal.Rptr. 556, 517 P.2d 820].) The record discloses a total lack of support for this contention.

## Failure to Charge Felony Murder

The defendants were charged by indictment with Fournier's murder in basic statutory language.[2] The indictment did not charge *felony* murder. The offense charged in the indictment includes both degrees of murder. The defendants could legally have been convicted of either degree if warranted by the evidence. Defendant Romo contends this denied him due process of law.

At trial the prosecution relied on the felony-murder theory as to the defendant Romo. Simple kidnapping is a felony inherently dangerous to human life, but is not enumerated in section 189 of the Penal Code. It will, however, support the application of a second degree felony-murder theory. *People* v. *Ford* (1966) 65 Cal.2d 41, 50 [52 Cal.Rptr. 228, 416 P.2d 132], held: "It has long been settled out that, in view of our simplified method of pleading in criminal cases, a jury may be instructed on felony-murder theories where the [indictment] charges murder with premeditation and malice aforethought. (*People* v. *Witt,* 170 Cal. 104, 107-108 [148 P. 928].)"

Romo's argument is devoid of merit. The facts proved against him were precisely those which he had admitted before the trial, and to which he testified at the trial. The trial court did not err in instructing the jury substantially that where the killing is done in the perpetration or attempt to perpetrate a felony not prescribed by section 189 of the Penal Code, the jury must find the killing to be second degree. (*People* v. *Witt* (1915) 170 Cal. 104, 107-108 [148 P. 928].) The jury may be properly instructed on a felony-murder theory of either degree which the evidence supports, where the accusatory pleading charges murder in statutory language. (*People* v. *Beach* (1968) 263 Cal.App.2d 476, 489 [69 Cal.Rptr. 394].).

## Diminished Capacity

Finally, Romo asserts prejudicial error in failing to properly instruct on diminished capacity. As we have heretofore indicated, the only diminished capacity evidence related to the intoxication of Romo.

---

[2] "[T]he said EDWARD ROMO and CAMERON LYNN DeWITT did then and there wilfully and unlawfully and feloniously and with malice aforethought, murder RICHARD GEORGE FOURNIER, a human being; contrary to the form, force and effect of the Statute . . . ."

In this connection, the trial court instructed the jury as follows, "In the crime of murder in which the defendant is accused in the indictment, a necessary element is the existence in the mind of the defendant of the specific state of mind hereafter to be defined. [¶] If the evidence shows the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such specific state of. mind. [¶] If from all the evidence you have a reasonable doubt whether defendant was capable of forming such specific s of m [state of mind], you must give the defendant the benefit of that doubt and find that he did not have such specific state of mind." (CALJIC No. 4.21, as modified.) Intoxication is the only basis asserted upon which a diminished capacity defense could have been based. Under such circumstances, this is the only and proper instruction to submit. (*People* v. *Graham* (1969) 71 Cal.2d 303, 316 [78 Cal.Rptr. 217, 455 P.2d 153].)

The second degree felony-murder instruction was given with simple kidnapping as the underlying felony. (CALJIC Nos. 8.32 and 9.20.) With these instructions, the jury was required to consider Romo's intoxication in determining whether he could achieve the specific state of mind required to commit the underlying felony. Error is claimed because the jury was not specifically so instructed. ■ In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole. We must also assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. (*People* v. *Henley* (1969) 269 Cal.App.2d 263 [74 Cal.Rptr. 611].)

■ Our review of the record does not reveal any objection by defendant Romo to the giving of CALJIC Nos. 4.21, as modified, and 8.32, nor do we find that any other instructions were requested. Under these circumstances, the defendant has waived the right to raise the objection on appeal. (*People* v. *Hawkins* (1968) 268 Cal.App.2d 99 [73 Cal.Rptr. 748].) In any event, the jury was instructed on the significance of voluntary intoxication as it bears upon the "state of mind" which is a necessary element of murder. The jurors were also instructed on the requirement of specific intent to kidnap as a basis for second degree felony (kidnap) murder. The court likewise instructed on the effect of diminished capacity induced by intoxication upon the specific mental states which are essential elements of murder. Although the precise instruction was not given (or requested) of which an error in omission is now charged, the jury was instructed to consider the instructions as a

whole. The instructions given on diminished capacity, viewed in combination, were the substantial equivalent of an instruction that diminished capacity could negate the specific intent required for felony murder.

The judgments of conviction are affirmed.

Regan, Acting P. J., and Paras, J., concurred.

A petition for a rehearing was denied April 25, 1975, and the petition of appellant DeWitt for a hearing by the Supreme Court was denied July 3, 1975.